3-0-9-1-0-4-0. Larry Coyne, affilee David Anditch v. Milan Police Pension Board, appellant Keith Carlson. Mr. Carlson, you may proceed. Good morning and may it please the Court. Mr. Anditch, Mr. Marcos. We're here over what Mr. Marcos described in the trial court as conflicts in testimony amongst experts. This is our second trip before this court and we're here to discuss what those conflicts are. The first, there are three main issues before the court today. The first is whether or not the manifest weight of the evidence supports the board's determination that Sergeant Larry Coyne was not disabled. The second question is whether or not Officer Coyne failed to take reasonable steps that would have remedied his condition. And the third is whether or not the trial court erred in barring the pension board from holding an evidentiary hearing to conduct further proceedings as ordered by this court to answer the couple questions that you sent back with last time we were here. Excuse me. With regard to the manifest weight of the evidence standard, two significant cases have come down since our last trip to this court. The first would be Marconi v. Chicago Heights Police Pension Board and the second is a recent decision that this court allowed me to supplement my brief with, which is Kramarski v. Orland Park Police Pension Board. Both of those cases highlight the standard for police pension cases in Illinois, which is if there is evidence in the record supporting the board's decision, it then meets the manifest weight of the evidence standard. More pointedly, in Marconi, the Supreme Court of Illinois upheld a decision where the sole physician with an opinion holding that the applicant was not disabled in a psychiatric disability case was Dr. Harris, the same physician that the Milan Police Pension Board, in this case, relied upon in denying Sergeant Coyne's application. But were there other doctors in that case? Yes, there were. There were other treating physicians as well as the other two doctors appointed by the pension board. All of them opined that the applicant in that case, Marconi, was disabled. Harris was the sole dissenter. Interestingly, in Kramarski, the physical disability on that case was the cross there. In that case, you had a cervical fusion case where there was surgery, the spine was fused, and there was only one physician who believed that the applicant was not disabled. And in that case, the first district upheld, and then reversed the trial court, upheld the pension board's decision holding that that was enough. One physician against treaters and against other experts appointed by the board is still sufficient to meet the manifest weight of the evidence standard. As an interesting side note in Kramarski, there is a lengthy footnote in applicant Coyne's brief that talks about how Dr. Harris is predisposed to rule against police officers. In Kramarski, he was the only physician that found that the applicant was psychiatrically disabled. It's important to note that because regularly throughout these proceedings, below as well as in this court, it has been the position of the plaintiff that somehow Dr. Harris was prejudiced against him and his prejudice against police officers in general. And then he cites a series of cases where Dr. Harris was the sole dissenting opinion. But in this case, or in Kramarski, we see that Dr. Harris is the sole dissenting opinion in that case, but it was in favor of the officer, showing that there really is no disposition. It is important under the manifest weight of the evidence standard to look at the pension board's decision, not the trial court's. And the record before this court demonstrates that there was a psychiatric evaluation performed on Coyne in 1990 where he was found to not be disabled, being that he was in perfectly fine mental health. It is also important to note that with regard to Dr. Harris, which seems to be the central question this court was concerned with when it remanded, is that Dr. Harris took into account more underlying facts than any other reviewing physician. He's the only one that interviewed a treating physician or a psychologist,  All of the physicians who reviewed or examined or treated the applicant, Mr. Coyne, all agreed that the stresses came from the workplace. Yet the only expert to speak to someone from the workplace was Dr. Harris. The pension board was impressed by the thorough nature of Dr. Harris's review of the facts in this case. In addition to that, it's important to note that Dr. O'Keefe, in his conversation with Dr. Harris, noted that he believed Coyne could work for a police department, he just couldn't work in my department. The only distinction between O'Keefe and Harris's assessments, both agree that he had a personality problem, both agree that he could work in another police department. The only difference is that O'Keefe concluded that Coyne was disabled and Dr. Harris did not agree with that conclusion. Something that's not uncommon. It's also important to remember that the manifest way to the evidence standard is not unique to administrative review cases. It is the very same standard that is used when this court or any other reviewing court examines a jury verdict. It is not uncommon in a medical malpractice case, in a products liability case, in a variety of different tort and criminal cases, that there is a battle of experts. And simply because one side has more experts that agree with its position than the other side does not render that case, or render that position, superior. And just because one expert stands out, and there's a litany of cases cited in our initial and our reply briefs that demonstrate that one expert is enough. One is enough. More pointedly, as Marconi points out, Dr. Harris individually is enough. Marconi is new law since this court had the opportunity to review this case last time. Makes it very clear. In addition to Dr. Harris's investigation, some of the other treating physicians spoke to Mrs. Coyne. Somebody who gets to speak with the applicant when he doesn't know he's being evaluated. Mrs. Coyne made two important statements. I believe it was Dr. O'Keefe. One, she said that the applicant Coyne's condition and symptoms were not prominent. And the second is that he responds well to treatment. In general, what happened with the condition, in this case the pension board believes based upon Dr. Harris, and many of the non-final conclusions of other treating and examining physicians, is that simply Sergeant Coyne had a personality disorder. He didn't get along with his coworkers. That is not a psychiatric disability. That is all that occurred in this case. It believes in Dr. Harris's thorough examination and review of the facts and conclusions. Important to note is that while much of the testimony was submitted, as is noted by the plaintiff in this case, was submitted on paper. It was a paper record because there were reports. But it did get to see the live testimony of the applicant Coyne. And it found that testimony to be unavailing, unconvincing, and incredible. And it based that upon contradictions that were in the medical reports, based upon these independent examiners as well as the treating physicians, about what Sergeant Coyne told them. In light of those, they found him to be incredible. Because of that incredibility, the ascertaining of facts from third parties became all the more critical to the pension board's analysis. The pension board in this case, again, the only physician that examined third parties or spoke with third parties was Dr. Harris. He's the only one that spoke to the employer about workplace stress, and he's the only one that spoke to an independent or a treating physician. He's the only one that broadly spoke there. And because of that, that was important because of the credibility concerns the board had with Coyne. The rest of these physicians were left with Mr. Coyne's subjective recounting of his condition. The board was not convinced by that. And if this court looks to Kramarski, a similar argument was put forward in that case, where it said that a discounting of subjective complaints is significant for a pension board's consideration and can be a basis for denying benefits. And in this case, it has that. It is also important to note with regard to Dr. Harris that Dr. Harris was never objected to in front of the pension board. Never did Mr. Coyne come in and say, Dr. Harris is predisposed to ruling against police officers. We don't want him reviewed by him. After he conducted his review, after this alleged shoddy treatment that Mr. Coyne alleged during his testimony at the hands of Dr. Harris, did he come forward and say, listen, before he issues his decision, this person, this physician was not fair. We want him barred. We would like a different examination. That never occurred. They never asked to cross-examine him. They never asked for Dr. Harris to be brought in for an opportunity to be cross-examined or examined at all. None of those things occurred. This entire problem with Dr. Harris was invented after Sergeant Coyne lost. With regard to the failure to take remedial action, that's the second issue in this case, there is significant evidence that demonstrates that Sergeant Coyne could have remedied his condition. Again, back to Mrs. Coyne. She said that his symptoms weren't prominent and that he responded well to medication. Nonetheless, Coyne admits also, or Coyne also admits that he responded well to medication, but he didn't take the prescriptions. He also said he responded well to therapy or his psychological work, I believe is the way that he referred to it in his testimony. Nonetheless, he never got psychiatric treatment or psychological therapy. Even though he had free therapy available to him still through the Employee Assistance Program through the Village of Milan, he refused it. Dr. Kelly, in this case, even though he found him disabled, agreed that the condition would be remedied within three to six months with remedial therapy and with some pharmacology. Yet, Coyne never did those things. Which is reasonable treatment, non-invasive, non-harmful. Coyne never said that he had some sort of catastrophic side effect, he feared, of the medication. He just didn't do it. Coyne could have remedied his condition and been back to work, but that wasn't what he was interested in. Again, it's important to note, as O'Keefe told Dr. Harris, Dr. O'Keefe said Larry Coyne would be fine being a police officer just someplace other than Milan. That is not disabled. Whatever psychological condition he had would have improved with treatment and likely would have resulted in him returning to work. Dr. Kelly said that it was reasonably expected to lead to full remission within three to six months if he just would have went to therapy and would have taken the prescriptions that he had taken in the past. Counsel, there's two minutes. Finally, with regard to the refusing to hold a hearing, further proceedings to this court, I will obviously defer to you what you meant by that. But traditionally, as was stated in People v. Webb at 109 Bill F. 328, 4th District in 1982, it says that the term further proceedings exactly means go forward and don't back up. In addition to that, traditionally, unless this court reaches a decision on all of the merits, the board is still free to examine new evidence and make new pleadings. With that, I'll reserve the remainder of time for a moment. Thank you, Mr. Carlson. Thank you. Mr. Anditch, you may respond. Thank you, Your Honors. May it please the Court. Counsel? Mr. Carlson? For the record, Your Honors, my name is David Anditch. I represent the plaintiff appellee, Larry Coyne. Your Honors, we look at this case quite differently from the way Mr. Carlson and the police detention board look at it. And I think at the outset, one of our biggest differences is the standard of review that this court should apply. What standard it should apply on the questions of fact, as well as the issue relating to Judge Lefstein's order, depends in part on what this court meant in its opinion seven years ago, in April of 2004, when you reversed and remanded the case with instructions to explain or articulate. Those are the two adjectives that the court used on the two issues that you reversed on. You said, send it back to the board. We've looked at all the evidence, and the evidence, of course, Your Honors, today is exactly the same as it was seven years ago. And what this court said seven years ago is, we've looked at the evidence, and we don't see any reason why the police pension board is entitled to any kind of deference on the fact-finding issues of whether Coyne was disabled or whether he took adequate remedies, because we can't understand, quite frankly, to the pension board how you ruled and relied only on the opinion of one physician versus five other physicians, psychiatrists and psychologists, who all said that one, Coyne was disabled, and secondly, four of the five said he should never hold a gun, he should never be a police officer, and he's not fit to be on the street with a gun. And so the court sent it back for the board to articulate and explain. So now the question on the standard of review is, what did the court mean when it said articulate and explain? Does it mean we come back and we stand here today on the manifest way to the evidence standard? Or does it mean that this court looks at the four-page opinion that took the board three years to write and 22 sentences and say, is that the articulation, the explanation that the court was looking for? Well, that's for the court to decide. We, of course, discuss at length those 22 one-sentence explanations to the board and say we think that none of them hold water as to why the board should have accepted Dr. Harris's opinion on the disability or Dr. Kelly's opinion on whether or not he had remedied the work, taken proper steps, remedial steps, I'm sorry. In that regard, Mr. Carlson and if I were standing there in his position, I'd argue that there is some kind of conflict and one doctor's opinion is enough. That's not the question under Marconi. It's not the question under Kramarski whether one doctor's opinion is enough. The question under the manifest weight of the evidence standard and Marconi and Kramarski, they didn't change any law. It's the exact same law that existed seven years ago. The question is when this court looks at the totality of the evidence under the manifest weight of the evidence, is a different result clearly evident? Clearly evident. That's the word that appears in virtually every opinion from the Supreme Court on down. And so for Mr. Carlson to stand here and say virtually any evidence will do it, I don't accept it. I don't think that's what the court meant. You know, if there's some evidence, any iota of evidence. And I think the best way to illustrate that is to say what the Supreme Court said it should become is a numbers game. What if Poyne had 30 experts and Mr. Carlson was sitting there with Kelly and Harris? Would one doctor's opinion be some evidence or enough evidence so that it should outweigh the opinions of 30 other psychiatrists and physicians? It seems to me the obvious answer is no. And so the manifest weight of the evidence test standard for this court to look at these two factual questions has got to have some meaning. It's got to include the totality of the evidence. And, of course, we emphasize on our side that there were five physicians and doctors who said he was disabled, that he had post-traumatic stress syndrome. You have one doctor who they're relying on who says it's a personality disorder. It seems to me it's a rather substantial difference between the two. But I want to stress something else about this battle of the evidence. I think the way it happened is perhaps by the board's initial brief where they sort of say, well, they're relying on five experts and we have one. And Marconi says some evidence is enough. And what was wrong with that and I think overlooked entirely in their two briefs and in this argument is the position of the employer and Chief Harris, neither one, of course, who is a physician. The employer is the village of Byland. And I find it incredibly ironic that Mr. Carlson would stand here and emphasize how important it was that Dr. Harris talked to the employer, whom he never identifies as who the employer is. The employer in this case is the village of Byland. What position did the village of Byland take in this case? I'm sure Your Honors read our brief. They agreed that Larry Coyne was disabled from the outset of the case. Thirteen years ago, the employer said, the village of Byland says, Larry Coyne is disabled. And there's no evidence in the record. And that's what they say in their post-trial filing before the police pension board. There's no evidence that indicates that he is anything but disabled and that he can go back to work. The only dispute the employer had in this entire case, the village of Byland, is whether it was a work-related disability, so he would get a line-of-duty disability or a not-on-duty disability. That is the only dispute that the employer had. So how Mr. Carlson and how the board can stand up here in front of Your Honors and say, give Harris great credit because he talked to the employer, and therefore you should reject the other five opinions, it doesn't make any sense. The employer said he was disabled. Now, let's look at one other person. Again, not a physician and not a psychiatrist or a psychologist. Let's look at Chief Dennis Berrics.  What did Dennis Berrics say as the head of the department, the guy who worked on a daily basis with COIN? He said COIN is unfit to be a police officer. Berrics' testimony supports Larry COIN. He said he was disabled. He said he wrote a letter that's in the record of this case. Chief Berrics says for the last year to Larry COIN, you've been irrational. What kind of a police officer logically and of sound mind is characterized by the chief of the department as irrational and who walks around without carrying any bullets in his gun in one of the most dangerous jobs you could have in America or anywhere else? So I think that, you know, in a way the case has gotten very focused on these six experts. Five of whom support COIN and one of whom, either Kelly or Harris, support the board on those issues. But I urge your honors to take a very serious look, a hard look, at what COIN's employer said and what Chief Berrics, who worked with him every day, said, the guy's disabled. And when you include that, you have those people. You have five doctors who said he's disabled. You have Judge Lestine now who has twice said he's disabled. We submit to the court the guy is disabled. And the pension board is absolutely wrong. And you can judge it under the manifest way to the evidence standard. You can judge it under whether the board articulated or explained whatever they did in their first opinion, which we don't feel they did. And we think the overwhelming evidence that he is disabled. I'd like to spend a minute or two on the other issues as to, with respect to the argument about whether COIN remedied his condition or was receiving the appropriate care. COIN testified that he was taking all the medications that were prescribed by his psychiatrist. He'd taken Zoloft, Trapadine, and one of the three medications prescribed. The evidence is unrefuted. He's taking all the medications that Dr. Narayan, his psychiatrist, prescribed. So the only issue that they have about whether or not he was taking proper remedial care is whether or not proper remedial care required him to see a psychiatrist and have weekly or biweekly consult. That's the issue. And under the MULAC decision, which this court cited in the first opinion, whose burden is it to prove that he was taking, that he wasn't doing the proper remedial care? It's not Larry COIN's burden under the law. And the MULAC decision is the leading decision on this. It's the pension board's. They didn't offer any evidence that he wasn't doing, that he wasn't taking proper remedial action. And the issue is, what kind of remedial action would have been required for a guy whose four physicians testified he should never hold a gun and be a police officer? So I really believe that's a non-issue. Finally, on that point, I would like to add, as this court recognized, and I call it COIN 1 in my brief. I hope your honors aren't bothered by that. We're going to have COIN 1 and COIN 2, like a lot of these police pension board cases have. So I started it out. In COIN 1, this court cited two or three different cases that stand for the proposition that economic ability counts as a defense to the remedy. COIN testified he has $70,000 in business on the trucking, $70,000 in debt on the trucking business. He starts, he owes Dr. Kelly $3,000 and $4,000. He has no income coming in. He said, I can't afford it. So then one of the board members says, what about the EAP? So COIN goes to the EAP for free counseling, and he has assigned a person by the name of Christine Butterworth, is what the record shows. He can't get along with her. He has an equally bad relationship with her, as he had with Ann Harris. And we submit to the court, COIN did everything he had to do. By taking that medicine, the board doesn't offer an iota of evidence to support its position that it was unreasonable for Larry COIN to refuse psychiatric care. There's no evidence that supports that. And on that basis, this court should rule in favor of COIN on that issue as well. Finally, I'd like to say something about, obviously, we filed a motion in front of Judge Lestine to ask for the injunction against the board hearing evidence. We believe Judge Lestine's order was absolutely correct. She read the mandate of this court. The mandate of the court to the board is to articulate or explain, obviously, the past record that was created. The one that made no sense to this court in 2004 and was the principal reason why you sent it back. There was nothing in this opinion, not a word, Judge Lestine found, that justified having an evidentiary hearing and expanding and the board trying to change the record. Finally, so I believe I would submit to the court that Judge Lestine was absolutely correct on that ruling, issuing the injunction precluding the evidentiary hearing. Finally, if I could spend a minute or two on the issue we raised in our brief. Thank you very much. The issue we raised in this appeal is one of due process of law, whether COIN has been denied due process of law by the last seven years of this case and what's happened. Did you cross appeal? We did not cross appeal, Judge. And that's the issue I wanted to address because counsel and the board makes a big issue that a cross appeal or a separate appeal was required. We disagree on that point as well as everything else we seem to disagree on, Judge. And the basis for our disagreement on this, we submit to the court no cross appeal or separate appeal is necessary. This court has, in this set of facts, this court has said on numerous occasions, and Murphy versus Murphy is one of the cases I'll cite to you, your own case in 2005, that if the decision can be affirmed on any basis in the record, it has to be affirmed. And the issue can be presented to the court and the trial court's decision has to be affirmed because if it's in the record, it does not have to be raised because if it's right, if the order, this court reviews orders, not reasons and not rationales. I don't have to tell the judges that. So if it's right, it's right. I would urge the court as our authority, Murphy versus Murphy, Central Illinois Electric versus Stepien. It's another decision. And Guzzo versus, I'm having trouble reading my writing. I'm sorry. But Guzzo versus, it looks like, D-Y-D-E-R or something. It's at 326. You'll have third, 1058. Murphy versus Murphy comes out of Rock Island, and that's why I'm citing it to the court. And that's a case in which Justice, Judge Jeffrey O'Connor, the Chief Judge of our court, tries a dissolution case, Murphy versus Murphy, and he uses the wrong law and the wrong statute to determine whether a prenuptial agreement between Mr. and Mrs. Murphy was valid or not. He's under the old statute, the old law, and as this court pointed out, Judge O'Connor should have been applying the current law. This court says that makes no difference. It doesn't matter if he used the wrong law. What we review is the results, the decision of the trial court, and they affirmed Judge O'Connor's decision in the Murphy dissolution, even though he applied all the wrong law. And that's why I believe, Your Honors, respectfully, we have every right to raise that due process issue, and with respect to the merits of it, although they don't say much about it, we believe there's two bases for the due process argument. One is the fact that the composition of the board changed, and there's three new board members, a whole new majority of the board, which made it impossible for that board to review, to articulate and explain what was in their minds seven years ago when three of the five board members are different. And just as importantly, we feel the three-year delay that the board took in issuing any opinion, and I'd like this court, I would love it if somebody would ask counsel to explain where was the board for the three years after this court had this case seven years ago, and they did nothing. They didn't write a word. They didn't issue any articulation. They didn't offer any explanation. They required us to go to court to sue for an injunction, and they didn't do anything until Judge Lestine said they had to write an opinion within 90 days and file it as its articulation and explanation. Due process means a timely and meaningful hearing. Larry Coyne didn't get it. I would ask this court, for all the reasons that we presented in Greece and here, to affirm the decision of Judge Lestine, reversing the board on all issues and awarding Larry Coyne pension. Thank you very much. Thank you, Mr. Anditch. Mr. Carlson. You may reply. Well, Mr. Anditch and I get along actually very well, despite what you may see here today. I guess I'll start with the due process argument and work backwards. First of all, there's no jurisdiction here. As Your Honor pointed out, there was no cross-appeal filed. In addition to that, Coway v. Midlothian Police Pension Board, not a divorce case, a pension board case,  you don't get to raise it in the appellate court for the first time. That is exactly the case here. In addition to that, you want to hear some of the reason for the delay for three years? It's because we were arguing about an injunction. And from the day that the petitioner asked or from when the plaintiff asked for the injunction to be issued, it took seven months to write its initial brief. So there's a significant portion of that time period that occurred during that three-year period. In addition to that, the time period once it was in the trial. From the day of the injunction, it only took seven months? For them to write their initial brief. Oh, okay. They asked for an injunction to be issued. We then entered into a briefing schedule, and I believe it was about seven months for them to write their first brief. How long was it from the man to the request for the injunction? I don't know off the top of my head, but I know the record will be able to answer that. In addition to that, there is only a unilateral expectation here. There is no property interest. Case law is very clear in Illinois. You do not have a property interest in a disability pension until the pension's been awarded. It's a unilateral expectation. That alone kills any due process argument. In addition to that, due process was followed here. He has the opportunity for a hearing. In addition to that, any delay that is a cause or a concern here is remedied by the fact that he has the opportunity to get back pay for any benefits he may be owed, which we believe he's not. And then finally, with regard to that, it kind of dovetails the rest of the due process argument back into the initial argument, which is he doesn't deserve a pension. So it's harmless error even if they waited a while. And the reason we talk about further proceedings, listen, this court knows what it meant when it wrote it. Whatever I say is not going to change that. Whatever Mr. Anders says is not going to change that, so I won't belabor that point much longer. What I will do is quote Marconi exactly, and I spent a little time at my table there looking this up. On page 534 of Marconi, the following quotation exists. If the record contains evidence to support the agency's decision, that decision should be affirmed. Now, whether or not that's new law or old law or a new spin, a new label on an old product, I'm not here to tell you what it is. What I am here to tell you is that that is the articulated standard of the Supreme Court of Illinois, and that if there is evidence in the record supporting the pension board's decision, that decision should be affirmed. See, in discussing standards of review, there's always been an interesting argument about is it just a numbers counting game or is there such a concept called sufficiency, which negates a numbers game? I've got three, you've only got one, therefore I win. Your Honor, I believe sufficiency, Justice Holder, is exactly the right opinion, and it renders the numbers game moot because, again, this is the same standard that's applied to a jury verdict. So if a jury verdict, it relies upon one expert over an army of other experts. This court and every other court in Illinois has always held it doesn't matter how many. It matters is there enough in the record to support their decision. Under the substantial evidence standard, which is a much higher standard than manifest weight, more than a scintilla of evidence meets that standard. Okay, so you're saying under manifest weight, what is your concept of sufficiency? Some evidence. Some? Some competent evidence. Okay, now we're starting to qualify it. Certainly. Okay, so competent evidence. Certainly, I believe competent evidence. I believe it's not evidence if it's not competent. So certainly I use that modifier, though, to make clear. No, I mean, we agree with the traditional analysis. If the board had only relied upon hearsay, is that evidence? Yes. Is it competent evidence? No. If they only relied on hearsay, does the overwhelming case law say that that board's decision should be overturned? Yes. But in this case, we have an expert, an expert that did something different than all the other experts. Counsel, that's one minute. With that being said, because he did something different, that's a reason for them to believe that doctor over the other doctors. Whether or not this court agrees with their analysis or disagrees with all due respect, is not the standard that it's supposed to be reviewed under. It is supposed to be reviewed based upon what the pension board did. And is there evidence in the record that supports that decision? Marconi makes clear, Dr. Harris is enough. It is not a numbers game. Mr. Anditch made much hay over the fact that because Dr. Harris spoke with people that reached different conclusions than him, those interviews are meaningless. That's like saying that a police officer who interviews somebody who gives them helpful information during a murder investigation or something else, but that person believes that the person is not the murderer, that means that that investigation is meaningless. So that interview with that witness is not proofful. Such is not a rational conclusion. The pension board believed that the investigation of speaking with the inexpert witness of the police chief led to many conclusions. And just because the police chief believes that an officer is acting irrationally, or if in fact he was acting irrationally, does not mean he's disabled. It is important to remember that a difficult person is not necessarily a disabled person. I don't think I can add to that, but does the court have any other questions? I don't believe there are. Thank you for your time. Thank you, Mr. Carlson, Mr. Anditch, for your very fine arguments this morning. Thank you very much. And it will be taken under advisement, and a written disposition will issue.